UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CR 25-353 PAM

| UNITED STATES OF AMERICA, | INFORMATION |
|---|---|
| Plaintiff, | 18 U.S.C. § 1343 |
| | 18 U.S.C. § 981(a)(1)(C) |
| v. | 21 U.S.C. § 853(p) |
| | 28 U.S.C. § 2461(c) |
| ANWAR AHMED ADOW, | |
| Defendant. | |

THE UNITED STATES ATTORNEY CHARGES THAT:

At times relevant to this Information:

1. The defendant devised and carried out a scheme to defraud Minnesota's Housing Stability Services Program, a Medicaid program designed to help people with disabilities and addictions find and maintain housing. Rather than provide such help, the defendant obtained and misappropriated millions of dollars in program funds that were intended as reimbursements for services provided to those people.

**A.    Background on Minnesota's Housing Stability Services Program**

2. In July 2020, Minnesota became the first state in the country to offer Medicaid coverage for Housing Stabilization Services. The Housing Stabilization Services Program is a Medical Assistance (that is, Medicaid) benefit designed to help people with disabilities, including seniors and people with mental illnesses and substance use disorders, find and maintain housing.

3. The Program permitted reimbursements for four principal kinds of services:

(a) Housing consultation, during which a consultant (like a social worker or nurse) helps a beneficiary complete a Department of Human Services form called a "Person-Centered, Housing Focused Plan." The Plan is a form available from the Department of Human Services. It requires minimal information. Consultants could bill Medicaid about $174 for a consulting session.

(b) Housing transition services, during which a provider helps a beneficiary plan for, find, and move into housing. Providers can bill about $68 per hour of transition services provided.

(c) Housing sustaining services, during which a provider helps a beneficiary keep their housing after they have moved in (including through behavioral management of the beneficiary). For sustaining services, too, providers can bill about $68 per hour.

(d) Moving expenses of up to $3,000, subject to conditions.

4.  By design, the Program had a low barrier to entry for new providers. A would-be provider needed only be at least 18 years old, submit some enrollment paperwork to Minnesota Department of Human Services, undergo a background check, and complete about five hours of online training videos. Providers did not have to have a medical license or social work training.

5.  Similarly, the Program had a low barrier to entry for beneficiaries. Beneficiaries needed only be at least 18 years old, have coverage under Medical Assistance (which is Minnesota's Medicaid program for people with low income), have a documented disability or "disabling condition," and be experiencing housing instability. Program rules defined those final two conditions expansively. To receive billable services, a beneficiary meeting these requirements just needed to complete, with a Program-qualified consultant, a document called a Housing Focused Plan, detailing their housing challenges and needs. That done, the beneficiary could enroll with a provider. And the provider could start billing for services provided.

6. To bill, a provider needed to submit only the names of the beneficiaries serviced, the types of billable services provided, and the hours worked.

7. The HSS Program's low barriers to entry and minimal records requirements for reimbursement combined to make the Program susceptible to fraud.

8. Before the Program's inaugural year, DHS predicted the Program would cost about $2.6 million annually. That proved to be inaccurate. In 2021 alone, the Program paid out more than $21 million in claims. That figure ballooned in the following years: $42 million in 2022, $74 million in 2023, $104 million in 2024. In just the first six months of 2025, the Program paid out another $61 million.

9. A federal investigation revealed that many Program providers defrauded the system. These providers acquired the names of Program-eligible beneficiaries from facilities like addiction treatment centers. They then used those individuals' information to submit inflated and fake reimbursement claims. In this fashion, the providers acquired substantial pay-outs of taxpayer money to which they were not entitled. They used those ill-gotten gains for their own enrichment.

B. **The Defendant and His Role**

10. The defendant ANWAR AHMED ADOW was the owner and principal of Liberty Plus LLC, a company based out of a business suite in Roseville, Minnesota. ADOW registered Liberty Plus LLC with the State of Minnesota in or about November 2022.

11. ANWAR ADOW used Liberty Plus to participate in the Housing Stability Services Program as a provider. In that role, ADOW and his employees at Liberty Plus were supposed to provide housing consulting, transitioning, and

sustaining services to qualifying people in need. Liberty Plus was paid at quarter-hourly rates and with Medicaid dollars based on the services it claimed to provide.

### The Scheme to Defraud the Housing Stability Services Program

12. From in or about March 2022 through in or about April 2025, in the State and District of Minnesota, and elsewhere, the defendant,

**ANWAR AHMED ADOW**,

and others known and unknown to the grand jury, did knowingly devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts.

13. The purpose of the scheme was to fraudulently obtain millions of dollars in Housing Stability Services Program funds by causing the submission of fake and inflated bills. As a Program provider, ADOW was responsible for providing program-eligible housing services to people in need. However, in furtherance of the scheme, ADOW and his conspirators caused the submission of false claims information that significantly overrepresented the hours of services they provided. In so doing, ADOW received HSS Program funds that substantially exceeded the services he and his company provided.

14. In furtherance of the scheme to defraud, in or about April 2024, ADOW applied with DHS for Liberty Plus to operate as an HSS provider. ADOW thereafter

4

purported to service individuals in need through Liberty from a business suite in Roseville, Minnesota.

15.    ADOW directed his employees at Liberty Plus to bill as much as they could. At the same time, ADOW made clear to those employees that he would not scrutinize the purported billable hours his employees submitted to him. In this way, ADOW incentivized his employees, who were paid hourly wages, to inflate their hours. As the company owner and principal, ADOW made more money when his employees overrepresented their billings—which ADOW then submitted for Program reimbursement.

16.    Ultimately, based on inflated and fraudulent claims, Liberty Plus received more than $1.2 million in Medicaid funds for services purportedly provided to approximately 200 beneficiaries.

17.    ADOW diverted much of those taxpayer dollars to his conspirators, including his employees at Liberty and his brother, Asad Adow.

18.    ADOW also spent proceeds from his scheme to lease a 2023 Mercedes-Benz CLA, to make investments, and to fund his lifestyle.

### Counts 1-4
(Wire Fraud)

19.    Paragraphs 1 through 19 are incorporated herein.

20.    From in or about March 2022 through in or about April 2025, in the State and District of Minnesota, and elsewhere, the defendant,

**ANWAR AHMED ADOW**,

and others known and unknown to the grand jury, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce certain signals and sounds, including emails using the email account PlusLibertyLLC@gmail.com, all in violation of 18 U.S.C. § 1343.

## FORFEITURE ALLEGATIONS

21. Count 1 of this Information is incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) in conjunction with Title 28, United States Code, Section 2461(c).

22. If convicted of Count 1 of this Information, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to Count 1 of the Information.

23. If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c).

Dated: September 18, 2025         JOSEPH H. THOMPSON
                                  Acting United States Attorney

                                  */s/ Daniel W. Bobier*
                                  DANIEL W. BOBIER
                                  Assistant U.S. Attorney